[Civ. No. 20259.   Second Dist., Div. Three.   Dec. 28, 1954.]

MODESTO VALDEZ et al., Respondents, v. TAYLOR
AUTOMOBILE COMPANY, Appellant.

Irving M. Walker, Potruch, Fredricks & Lerten and Erwin Lerten for Appellant.

· Dreher & McLeod, Robert H. Dreher and Richard B. Levitt for Respondents.

VALLÉE, J.—Modesto Valdez, referred to as plaintiff, brought this action for damages for the alleged failure of defendant Taylor Automobile Company, referred to as defendant, to obtain public liability and property damage insurance on the sale by the latter of a used automobile to plaintiff. The complaint, in several counts, alleged: breach of an oral contract to procure insurance; negligent failure to procure insurance; fraud and deceit in promising to procure insurance; estoppel. The Danielsens were joined as parties plaintiffs on the theory they were third party beneficiaries of the contract between plaintiff and defendant. The cause was tried by a jury which returned a verdict in favor of plaintiff against defendant for $18,465. Defendant appeals from the judgment which followed.

Defendant is a dealer in used automobiles in Los Angeles. At the time in question it was licensed as an insurance broker. On April 1, 1950, and prior thereto, defendant in a large advertisement of used cars in the Los Angeles Times and other Los Angeles newspapers gave the monthly payments of various makes of cars and stated: "Monthly payments below are based on ⅓ down and include insurance & sales tax." On its used car lot defendant had a large sign which said, "FREE PAYMENT GUARANTEE ACCIDENT POLICY." One Drobnis was in defendant's employ as credit manager and "closer." On April 1, 1950, plaintiff visited the lot, talked to a salesman, selected a car, and was turned over to Drobnis by the salesman. The sale was made under a conditional sales contract. It was the duty of Drobnis to write up a purchase order, a credit statement, a conditional sales contract, and other papers. It was also his duty, when a sale was made under a conditional sales contract, to see that defendant's interest in the car was covered by insurance. He obtained from plaintiff the information necessary to write the insurance. Plaintiff told him that he (plaintiff) wanted "full coverage insurance to protect myself"; he told Drobnis, "Well, I want the kind that covers up the next party in case you have an accident," that he wanted "full coverage insurance to cover the other man." Drobnis said "O.K." Plaintiff testified

Drobnis "told me he'd get it for me. He didn't tell me how much it would be." Plaintiff also testified, "[T]he way I understood full coverage insurance, the way—the kind of insurance I wanted was insurance that would protect me and protect anybody else if I ever had an accident or anything on the road with my car, and I wanted to be protected, fully protected, and protect any other party, . . . I just wanted to be sure that insurance would back me in case I ever had an accident." Drobnis figured the down payment and the monthly payments on a piece of scratch paper, and showed the paper to plaintiff. The paper indicated the insurance premium was $141. Plaintiff said to Drobnis, "How come so much?" to which Drobnis replied, "That's the kind of insurance you are asking for. That's why we are charging you that much."

The conditional sales contract, the purchase order, and the credit statement were printed forms with blanks to be filled in to fit the particular case. Plaintiff signed the conditional sales contract in blank. A filled-in copy was mailed to him later. The conditional sales contract and the purchase order stated that plaintiff made application to defendant to insure the car, "Comprehensive 18 mos: Prem. $21.00 $50.00 Deductible Collision 18 mos: Prem. $120.00." On the purchase order the word "None" was written over the words "Vendor's Single Interest Fire and Theft" and over the words "Vendor's Single Interest Collision." Under the latter words there appeared "B.I. & P.D. Ins.," and opposite these in the column headed "premium" the symbol "$" was placed by Drobnis in the presence of plaintiff. "B.I. & P.D. Ins." means bodily injury and property damage insurance. Plaintiff did not read the purchase order before he signed it, nor until after the accident to be later described. He did not read the conditional sales contract until after the accident.

About May 1, 1950, plaintiff's wife received an insurance policy through the mail. She told plaintiff it had come. He did not see it until after the accident when he discovered for the first time that he did not have public liability and property damage insurance. The policy covered only "Comprehensive-Loss of or damage to the Automobile, except by Collision or Upset but including Fire, Theft and Windstorm" and "Collision or Upset."

An expert in the automobile insurance field gave testimony, without objection, from which it may be inferred that in the trade "full coverage," when expressed by a layman, includes

public liability and property damage insurance. He testified that if a layman asks for "full coverage" or "the kind of insurance that protects me or the other fellow," it would be understood that he meant the basic limits: "$5,000.00 bodily injury liability for one person, $10,000.00 for all persons in one occurrence; $5,000.00 property damage," which were the minimum amounts written for bodily injuries and property damage in 1950. (See Veh. Code, § 415.)

About October 29, 1950, plaintiff was involved in a collision between the car purchased from defendant and one owned by the Danielsens. The Danielsens brought an action against plaintiff for personal injuries and property damage arising out of the collision. Plaintiff notified defendant of the action and demanded that defendant defend it. Defendant refused to do so. Judgment was rendered in that action against plaintiff for $15,000 for injuries sustained by Walter Danielsen, for $3,000 for injuries sustained by Constance Danielsen, for $450 for property damage, and for $15 costs, a total of $18,465. That judgment became final before this action was commenced.

After both sides had rested, a conference was had between the trial judge and counsel. The judge stated that "all counsel have indicated complete agreement on all of the instructions." The judge further stated that he had modified some of them and asked counsel to examine them. Counsel did so and said they had "all agreed that they were proper and may be given to the jury subject to the Court's approval." The court asked counsel whether they would stipulate "that all the instructions, other than those stipulated to yesterday, that had been proposed by respective counsel were withdrawn by the proposing counsel." Each counsel so stipulated. The court gave this instruction:

"The instructions I am giving you have been prepared and agreed to between the Court and counsel for all of the parties as fairly representing the issues of the case, and in order to simplify and assist you in arriving at a fair and just verdict.

"For the purposes of determining a verdict in this case it is agreed between all parties in this case that verdicts will be either for Valdez, as plaintiff, or Taylor Automobile Company, as defendant, so that the following instructions are not to be considered by you as prejudicial to the defendant or the plaintiffs because of the fact that the Danielsens are not mentioned herein by name.

"I instruct you that if you believe the plaintiff's evidence

in this case you may then find for the plaintiff on one of two theories, but not on both, as follows:

"1. The first theory is based on contract. If you find that there was a contract for insurance between the plaintiff and defendant you will then bring in a verdict for plaintiff for $8450.00. I further instruct you that in order for you to find that a valid and binding contract of insurance was entered into between the plaintiff, Valdez, and the defendant, Taylor Automobile Company, that you must first determine that the essential elements of a contract existed at the time; these are: 1. Parties capable of contracting, 2. Consent, 3. A lawful object and 4. A sufficient cause or consideration.

"2. The second theory is based on fraud, deceit, negligence or estoppel, and if you find that plaintiff has proved any one of these, you will then return a verdict for plaintiff for $18,465.00." The terms fraud, deceit, negligence, and estoppel were then defined for the jury.

Since the verdict was for $18,465, it is patent that it was not predicated on a finding that there was a contract of insurance between plaintiff and defendant, and that it was based on a finding of either fraud, deceit, negligence, or estoppel. Defendant first contends the evidence was insufficient to support the verdict on either of these grounds. As to a finding of fraud, it is argued that plaintiff did not justifiably rely on the representations; that he did not read the purchase order, the sales contract, or the policy; that if he had, he would have known immediately he was not receiving liability insurance.

Plaintiff was 23 years of age, with the education of a 15-year-old child; he went as far as the tenth grade and can read and write English. Drobnis graduated from high school, junior college, and had several years of law school. He represented to and promised plaintiff that he would procure "full coverage" for him, insurance that would protect him if he ever had an accident. A fair inference is that Drobnis knew what "full coverage" meant—defendant was an insurance broker, he was the credit manager and "closer," the man who filled out the forms and closed the deal after a salesman had sold the prospect; and the purchase order and the conditional contract forms had the abbreviations "B.I. & P.D. Ins." for bodily injury and property damage on them with space for the premium. Plaintiff relied on the representation and promise. It may reasonably be inferred that Drobnis had no intention at the time of the sale of ful-

filling the representation or of keeping the promise. The evidence made a case of fraud and deceit.

The fact that plaintiff did not read the papers does not preclude a finding that he justifiably relied on the representation and the promise ▇ In *Raulet* v. *Northwestern etc. Ins. Co.*, 157 Cal. 213 [107 P. 292], it is said (p. 230): "It must be presumed, ordinarily, that persons are familiar with the terms of written contracts to which they are parties, and in the absence of fraud they are justly bound by the provisions therein, but the rule should not be strictly applied to insurance policies. It is a matter almost of common knowledge that a very small percentage of policy-holders are actually cognizant of the provisions of their policies and many of them are ignorant of the names of the companies issuing the said policies. The policies are prepared by the experts of the companies, they are highly technical in their phraseology, they are complicated and voluminous—the one before us covering thirteen pages of the transcript—and in their numerous conditions and stipulations furnishing what sometimes may be veritable traps for the unwary. The insured usually confides implicitly in the agent securing the insurance, . . .." ▇ In *Security-First Nat. Bank* v. *Earp,* 19 Cal.2d 774 [122 P.2d 900], the trial court found that the defendants signed an instrument without reading it, in reliance on the representation of the plaintiff's employee. The plaintiff appealed, claiming that defendants' failure to read the instrument precluded them from setting up misrepresentation of the contents as a defense. The court held (p. 777): "His negligence in failing to read the contract does not bar his right to relief [Citations] if he was justified in relying upon the representations. [Citations.] ▇ Contributory negligence is no defense to an intentional wrong." In *Golden Gate Motor Transport Co.* v. *Great American Indem. Co.,* 6 Cal.2d 439 [58 P.2d 374], the court stated (p. 443): "It is next asserted that the plaintiff having accepted and retained the policy is charged with knowledge of its terms, is bound by it, and is estopped from asserting that it did not know the terms of the policy. It cites and relies on *Madsen* v. *Maryland Cas. Co.,* 168 Cal. 204 [142 P. 51], and *Burch* v. *Hartford Fire Ins. Co.,* 85 Cal.App. 542 [259 P. 1108]. Those cases involved statements made by the insured in their written applications. In neither one did it appear that there was no written application and that after the insured had made a request for full coverage the insurer delivered a document

which it represented covered the demand as made. If defendant contends that the plaintiff may not recover because it did not read the policy, such contention may not be sustained. . . . (P. 445) 'It would certainly have been an act of prudence on his part to read the entire policy, but his neglect to do so cannot excuse the company for the default of the agent in not writing the contract in accordance with the representations made by the insured. The insured had a right to rely upon the agent's performing his duty of making the contract in conformity with the information given; and the agent's failure to do so, whether the result of a mistake or of a deliberate fraud, cannot operate to the prejudice of the insured.' '' ■ A wrongdoer cannot shield himself by asking the law to condemn the credulity of the ignorant and unwary.

As to a finding of negligent failure to procure full coverage, it is argued that since the jury impliedly found there was no contract to obtain public liability and property damage insurance for plaintiff, defendant had no duty to procure that insurance; and in the absence of a contractual duty, plaintiff cannot recover for defendant's negligent failure to do so. The argument is fallacious. ■ It is well established that a person may become liable in tort for negligently failing to perform a voluntarily assumed undertaking even in the absence of a contract so to do. ■ A person may not be required to perform a service for another but he may undertake to do so—called a voluntary undertaking. In such a case the person undertaking to perform the service is under a duty to exercise due care in performing the voluntarily assumed duty, and a failure to exercise due care is negligence. Dean Prosser says, '' [I]f the defendant enters upon an affirmative course of conduct affecting the interests of another, he is regarded as assuming a duty to act, and will thereafter be liable for negligent acts or omissions,'' and ''If the defendant receives the plaintiff's property or papers, and undertakes, without consideration, to obtain insurance, . . . he assumes a duty to use proper care in the performance of the task. . . . In many cases the court has laid stress upon the fact that the plaintiff has relied upon the conduct of the defendant to his damage, and has indicated that this is essential to liability. Notwithstanding an early New York case to the contrary, there is authority that where the defendant has reason to expect such reliance to the plaintiff's detriment, even a mere gratuitous promise will be enough to create a

duty, for the breach of which a tort action will lie.'' (Prosser on Torts, 190, 195, 196, § 32.)   *Stark* v. *Pioneer Cas. Co.,* 139 Cal.App. 577 [34 P.2d 731], was predicated on the negligence of an insurance company's agent in failing to forward to the company an application and premium for insurance.   The court held there was no contractual relation, that the company was bound either to furnish the insurance or to decline to do so within a reasonable time, and that having failed to perform its duty it was liable for the actual damage not exceeding the amount of insurance purchased.   (See also *Griffin* v. *County of Colusa,* 44 Cal.App.2d 915, 923 [113 P.2d 270]; *Wice* v. *Schilling,* 124 Cal.App.2d 735, 746 [269 P.2d 231]; *Smith* v. *Minnesota Mut. Life Ins. Co.,* 86 Cal. App.2d 581 [195 P.2d 457]; *Evan L. Reed Mfg. Co.* v. *Wurts,* 187 Ill.App. 378; 4 Appleman, Insurance Law and Practice, 115, § 2261; anno. 32 A.L.R.2d 487; 38 Am.Jur. 659, § 17. And see *Linnastruth* v. *Mutual Benefit etc. Assn.,* 22 Cal.2d 216, 219 [137 P.2d 833], in which it is said that the facts in the Stark case were sufficient to constitute negligence or estoppel.)

The pivotal question is the measure of damages.   If defendant had procured public liability and property damage insurance, plaintiff would have had insurance in the amounts of $5,000 bodily injury liability for one person, $10,000 bodily injury liability for all persons in one occurrence, and at least $1,000 property damage.   (See Veh. Code, § 415.)   The liability of the insurer under the Danielsen judgment would have been limited to $5,000 for the injuries sustained by Walter Danielsen, $3,000 for the injuries sustained by Constance Danielsen, $450 for property damage, and $15 costs —total $8,465.   Defendant says the measure of liability for failure to procure insurance is the amount which would have been due under the policy less the amount of premiums which would have been paid, and that the judgment should be reduced to $8,465.   Plaintiff counters that defendant stipulated that in the event the jury found there was no contract, and if they found there was fraud, deceit, negligence, or estoppel, they should return a verdict for plaintiff for $18,465; that pursuant to the stipulation the court so instructed the jury; and that defendant will not be heard to renege on his stipulation on review.   He counters further that in any event the amount of the judgment the Danielsens obtained against him is the measure of liability for the tort.   Defendant replies that a stipulation as to jury instructions ''is solely an agreement

that the legal principles stated in the instructions are correct,'' and that a binding stipulation may not be made as to questions of law.

Defendant did more than stipulate that the legal principles stated in the instruction were correct. It stipulated that in the event the jury found liability for tort the judgment for plaintiff should be $18,465. The effect of the instruction was to direct a verdict for plaintiff for $18,465 in the event the jury found tort liability. The question is whether this court is bound by the stipulation. *San Francisco Lbr. Co.* v. *Bibb*, 139 Cal. 325 [73 P. 864], was an action on a contractor's bond. The court stated the bond was void ''unless we are limited by a stipulation entered into by counsel, in an agreed statement of facts in the lower court, that the sole question for determination should be, whether the failure of the plaintiff, as materialman, to file a lien relieved the sureties on the bond.'' It was held (p. 326) : ''Counsel, under section 1138 of the Code of Civil Procedure, may agree as to the facts, but they cannot control this court by stipulation as to the sole, or any, question of law to be determined under them. When a particular legal conclusion follows from a given state of facts, no stipulation of counsel can prevent the court from so declaring it. In this case the bond is void, and hence it is immaterial whether the failure of the materialman to file a lien did, or did not, relieve the sureties, as they were never obligated under it.'' *Owen* v. *Herzihoff*, 2 Cal. App. 622 [84 P. 274], held that a stipulation that a ''lease had expired by its terms,'' being a stipulation as to the erroneous interpretation of the legal effect of the contract, should be disregarded. *People* v. *Singh*, 121 Cal.App. 107 [8 P.2d 898], says that a reviewing court is not bound by an erroneous stipulation as to a conclusion of law which is not a stipulation of fact. In *McCormick* v. *Woodmen of the World*, 57 Cal. App. 568 [207 P. 943], among the conditions subject to which a benefit certificate was issued to and accepted by McCormick, was ''one which provided that the absence or disappearance of a member holding the certificate from his last-known place of residence for any length of time should not be sufficient evidence of his death, and that no right should accrue under such a certificate to a beneficiary or beneficiaries, nor any benefits be paid until proof had been made of the death of said member, while in good standing'' only. There was no proof that McCormick was dead. The proof was that he had been absent and neither seen nor heard from for more than

seven years, and was therefore presumed to be dead. (Code Civ. Proc., § 1963, subd. 26.) The court held that the provision in the certificate was violative of section 1963, subdivision 26, and hence would not be given effect.

Swift & Co. v. Hocking Valley R. Co., 243 U.S. 281 [37 S.Ct. 287, 61 L.Ed. 722], was an action against Swift for demurrage charges on railroad cars which remained unloaded for more than the 48 hours free time on a switch used in connection with its warehouse. The parties stipulated that the track on which the cars in question were placed was the private track of Swift. The record disclosed on admitted facts contrary to the stipulation that the track in question was not a "private track." The court said (61 L.Ed. 725): "If the stipulation is to be treated as an agreement concerning the legal effect of admitted facts, it is obviously inoperative; since the court cannot be controlled by agreement of counsel on a subsidiary question of law. See cases cited in the margin.[1] If the stipulation is to be treated as an attempt to agree 'for the purpose only of reviewing the judgment' below, that what are the facts shall be assumed not to be facts, a moot or fictitious case is presented. 'The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted in the particular case before it. . . . No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard.' California v. San Pablo & T. R. Co., 149 U.S. 308, 314 [13 S.Ct. 876, 37 L.Ed. 747, 748]. See Mills v. Green, 159 U.S. 651, 654 [16 S.Ct. 132, 40 L.Ed. 293, 294]. The fact that effect was given to the stipulation by the appellate courts of Ohio does not conclude this court. See Tyler v. Judges of Court of Registration, 179 U.S. 405, 410 [21 S.Ct. 206, 45 L.Ed. 252, 254]. We treat the stipulation, therefore, as a nullity." (See also Little v. Giles, 118 U.S. 596 [7 S.Ct. 32, 30 L.Ed. 269]. Sanford's Estate v. Commissioner of Int. Rev., 308 U.S. 39, 51 [60 S.Ct. 51, 59, 84 L.Ed. 20, 26]; Nelson v. Montgomery Ward & Co., 312 U.S. 373, 376 [61 S.Ct. 593, 595, 85 L.Ed. 897, 899]; Jensen v. Northwestern Underwriters'

---

[1]The cases referred to are: San Francisco Lbr. Co. v. Bibb, 139 Cal. 325 [73 P. 864]; Owen v. Herzihoff, 2 Cal.App. 622 [84 P. 274]; Aubuchon v. Bender, 44 Mo. 560; Prescott v. Brooks, 62 N.D. 771 [94 N.W. 88, 94]; Holms v. Johnston, 59 Tenn (12 Heisk.) 155. See also Breeze v. Haley, 11 Colo. 351, 362 [18 P. 551]; Lyon v. Robert Garrett Lbr. Co., 77 Kan. 823, 827 [92 P. 589]; Wells v. Covenant Mut. Ben. Assn., 126 Mo. 630, 639 [29 S.W. 607].

*Assn.,* 35 N.D. 223 [159 N.W. 611, 613]; anno.: 92 A.L.R. 663.)

■ The stipulation that the jury be instructed that if they found a tort the verdict should be for $18,465 was not a stipulation of fact. It was a stipulation as to the legal effect of the facts—a conclusion of law. And as we shall see it was an erroneous conclusion from the facts and as such is not binding on this court. We pass to a consideration of the correct measure of damages for the tort under the particular facts of the case.

One who wilfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers. (Civ. Code, § 1709.) Generally the measure of damages for a tort "is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not." (Civ. Code, § 3333.) For the purpose of estimating damages, the value of an instrument in writing is presumed to be equal to that of the property to which it entitles its owner. (Civ. Code, § 3356.) Damages must, in all cases, be reasonable; and where an obligation of any kind appears to create a right to unconscionable and grossly oppressive damages contrary to substantial justice, no more than reasonable damages can be recovered. (Civ. Code, § 3359.)

■ A plaintiff is required, as a general rule, to have sustained an actual detriment from the particular injury of which he complains before he can be compensated for its infliction. (14 Cal.Jur.2d 646, § 17. See cases collected in West's Civil Code Annotated, § 1709, p. 472.) ■ A person who wrongfully omits to perform a particular act required of him is liable in damages for all of the consequences which, in the natural course of events, may ordinarily ensue therefrom. (*Wells* v. *Lloyd,* 6 Cal.2d 70, 83 [56 P.2d 517].)

■ A proximate causal connection must exist between the damage sustained by the plaintiff and the defendant's wrongful omission, and the detriment inflicted on the plaintiff must be the legal and natural result of the defendant's failure to act. (*Chidester* v. *Consolidated Ditch Co.,* 53 Cal. 56, 57; *Wells* v. *Lloyd, supra,* p. 83.) ■ Where, from the nature and circumstances of the case, a rule may be discovered by which adequate compensation may be accurately measured, such a rule should be applied in actions of tort. ■ A plaintiff in a tort action is not, in being awarded damages, to be

placed in a better position than he would have been had the wrong not been done. (25 C.J.S., 588, § 80.)

*Thomas* v. *American Workmen,* 197 S.C. 178 [14 S.E.2d 886, 136 A.L.R. 1], was an action for fraud and deceit in the issuance of an insurance policy. The agent represented to the plaintiff that the sick benefit provision of the policy would cover sickness of any character which she might suffer; and that such sick benefits, amounting to $12 a week, would become operative and payable from the first day of illness. The policy issued provided for the payment of $6.00 a week for sick benefits, excepted certain disabling illnesses, and excluded the first week's sickness from the benefit provision. The plaintiff had been ill and disabled for two weeks. The jury returned a verdict for $100. On motion for a new trial the court reduced the amount to $24. Affirming, the court said (136 A.L.R. 5): "As a general rule, one injured by the commission of fraud is entitled to recover such damages in a tort action as will compensate him for the loss or injury actually sustained, and place him in the same position that he would have occupied had he not been defrauded. 24 Am. Jr. Section 217, Page 47. The recovery is restricted in all cases to such damages as were the natural and proximate consequences of the fraud, and such as can be clearly defined and ascertained, including those which were actually or presumptively within the contemplation of the parties when the fraud was committed. 24 Am.Jur. Section 218, Page 48; 27 CJ Section 228, Page 83. The evidence in this case shows, as heretofore stated, that the plaintiff was confined to her bed from a serious illness for a period of two weeks, which was certified to by her attending physician. If she had obtained the policy she contracted for she would have been paid $24, covering the period of two weeks. And this is the amount of actual loss she has sustained. Such damages under the evidence were the natural and proximate consequences of the fraud. In our opinion, the trial Judge took the correct view of the law, and committed no error."

What is the actual detriment sustained by plaintiff as a proximate result of defendant's tort? The question is answered by asking: What would the policy have been worth to plaintiff if it had been as Drobnis represented and promised it would be? The amount is capable of precise mathematical calculation. It would have been $8,465, no more. Insurance which would have given plaintiff protection of $5,000 for injury to one person, $10,000 for all persons in one

occurrence, and at least $1,000 for property damage would have fulfilled Drobnis' representation. It could not reasonably be understood as a promise of coverage in an unlimited amount. The damage suffered by plaintiff as a result of the tort of defendant being fixed and certain, it was error to instruct the jury that, in the event it found tort liability, it should return a verdict for plaintiff for $18,465.

The judgment is modified by reducing the amount thereof to $8,465. As thus modified, it is affirmed.

Shinn, P. J., concurred.

Wood (Parker), J., concurred in the judgment.

A petition for a rehearing was denied January 24, 1955, and respondents' petition for a hearing by the Supreme Court was denied February 24, 1955. Gibson, C. J., Carter, J., and Traynor, J., were of the opinion that the petition should be granted.